# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 17-1667

———————————————

Mark Eugene Woodworth

*Plaintiff - Appellant*

v.

Kenneth Hulshof

*Defendant - Appellee*

Lyndel Robertson; Rochelle Koehly; Brandon Patrick Hagan

*Defendants*

William S. Lewis, in his capacity as Personal Representative of the Estate of
Kenneth Lewis

*Defendant - Appellee*

Gary Calvert; Terry L. Deister; R. Brent Elliott; Rachel Smith; John Williams;
David Miller; Livingston County; Livingston County Sheriff's Department; City of
Chillicothe, Missouri; City of Chillicothe, Police Department; Jenny Smith; Bruce Clemonds

*Defendants*

————————

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

————————

Submitted: November 14, 2017
Filed: June 6, 2018
_____

Before COLLOTON and GRUENDER, Circuit Judges, and HOLMES,[1] District Judge.

_____

GRUENDER, Circuit Judge.

Mark Woodworth appeals the district court's[2] adverse grant of summary judgment in this civil-rights action, in which he alleges that prosecutor Kenneth Hulshof and Judge Kenneth Lewis conspired to deprive him of his constitutional rights during criminal proceedings related to a 1990 homicide. His resulting convictions were overturned largely due to Hulshof's and Judge Lewis's handling of the case. Because both officials are entitled to absolute immunity, we affirm.

**I.**

The events giving rise to this case were detailed extensively during Woodworth's habeas proceedings before the Missouri Supreme Court. *See State ex rel Woodworth v. Denney*, 396 S.W.3d 330 (Mo. banc 2013). As relevant here,[3] in

_____

[1]The Honorable P.K. Holmes, III, Chief Judge, United States District Court for the Western District of Arkansas, sitting by designation.

[2]The Honorable Fernando J. Gaitin, Jr., United States District Judge for the Western District of Missouri.

[3]While many facts remain in dispute, we construe the record in the light most favorable to Woodworth and give him "the benefit of all reasonable inferences supported by the evidence," as we must in reviewing the grant of summary judgment against him. *See B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013); *Reasonover v. St. Louis Cty.*, 447 F.3d 569, 578 (8th Cir. 2006).

November 1990, two of Woodworth's neighbors were shot while sleeping at their home in rural Livingston County, Missouri. Lyndel Robertson survived despite sustaining multiple gunshot wounds to the face, but his wife Catherine died from her injuries. Although Lyndel did not have a clear recollection of the attack, he initially accused Brandon Thomure, his daughter's ex-boyfriend, and insisted that charges be brought against him. At some point, however, Lyndel abandoned this theory, and the investigation stalled due to the absence of credible evidence.

As the months passed, Lyndel became increasingly frustrated with the lack of progress in identifying the assailant. Thus, in June 1991, he hired private investigator Terry Deister to look into the matter. At the time, Deister was also assisting Lyndel with an unrelated civil lawsuit involving Woodworth's father. Deister almost immediately focused his attention on Woodworth, who was sixteen at the time of the shootings. From there, Deister went on to play an outsized role in the official investigation, gaining access to the sheriff's investigatory files and convincing the chief deputy to treat Woodworth as the prime suspect. Eventually, with Deister spurring the investigation, law enforcement discovered forensic evidence that supported his theory of Woodworth's guilt.

Lyndel presented these findings to Livingston County Prosecuting Attorney Doug Roberts, who was not convinced that there was sufficient evidence to bring charges against Woodworth. This reluctance prompted Lyndel to send a letter to Judge Lewis requesting that Roberts "be released of his duty" as to the matter. Judge Lewis provided a copy of this letter to Roberts, who vehemently objected to the characterization that he had a "lack of enthusiasm" for the case. He also suggested that Lyndel was unreliable given that he originally accused Thomure. Nevertheless, in a letter dated October 5, 1993, Roberts disqualified himself and asked that Judge Lewis appoint the Missouri Attorney General's Office ("AGO") to handle the matter.

Two days later, Judge Lewis appointed the AGO as special prosecutor and convened a grand jury. He also sent a letter to then-Assistant Attorney General Hulshof detailing these developments. Enclosed with the letter was the appointment order, as well as a copy of Lyndel's letter requesting Roberts's removal and Roberts's response (collectively, the "Lewis Letters"). As revealed at subsequent proceedings, these documents contained both impeachment and exculpatory evidence relevant to Woodworth's defense. For example, Judge Lewis admitted that it was Lyndel's request that prompted him to convene the grand jury, casting doubt on the impartiality of the process. The Roberts letter also made clear that Lyndel had originally accused Thomure, undermining his credibility as a witness against Woodworth.

Even before receiving the Lewis Letters, Hulshof was aware of the investigation, as Judge Lewis had called him on at least one previous occasion to discuss the matter and to inquire about the AGO's process for selecting special prosecutors. During these discussions, Judge Lewis also indicated his preference that Hulshof handle the matter due to his familiarity with Livingston County. However, an AGO supervisor made the final decision to assign Hulshof to the investigation.

After his appointment, Hulshof familiarized himself with the case by reviewing the investigatory file and speaking with several witnesses. He immediately noticed some "pretty unusual" circumstances surrounding the investigation, including the involvement of a private investigator. Notwithstanding these irregularities, Hulshof presented evidence to the grand jury against only Woodworth, who was ultimately indicted on a variety of charges. Judge Lewis thereafter presided over the hearing at which Woodworth was certified to stand trial as an adult.

In 1995, a jury convicted Woodworth of all charges, which included second-degree murder, first-degree assault, first-degree burglary, and two counts of armed criminal action. The Missouri Court of Appeals later reversed these convictions because the trial court excluded evidence implicating Thomure as an

alternative suspect. *See State v. Woodworth*, 941 S.W.2d 679, 700 (Mo. Ct. App. 1997). However, Woodworth was convicted of the same crimes at a second trial. Judge Lewis was not involved in either of these trials, and Hulshof's involvement ended after he secured a conviction at the first trial.

Years later, Woodworth learned of the existence of the Lewis Letters from a reporter, and on the basis of this new evidence, he filed a habeas petition with the Supreme Court of Missouri. *See Denney*, 396 S.W.3d at 336. That tribunal appointed a special master to take evidence and make preliminary findings. After spending more than a year on the case, the special master "strongly recommend[ed]" vacating Woodworth's conviction, concluding that the State had committed at least two *Brady* violations by failing to disclose the Lewis Letters and evidence that implicated Thomure. *Id.* The special master's report also highlighted other irregularities with the investigation and initial prosecution, including conflicts of interest involving Judge Lewis's personal attorney[4] and Woodworth's original defense counsel.[5] The court adopted the special master's findings in full and vacated Woodworth's second conviction in light of the *Brady* violations. *Id.* at 347. Although the State subsequently initiated a third case against Woodworth, it dismissed all charges after ballistics evidence was excluded due to chain-of-custody problems.

Upon his release from prison, Woodworth brought this action pursuant to 42 U.S.C. § 1983 against Hulshof, Judge Lewis, and a number of other individuals and

---

[4]As the district court explained, attorney Brent Elliott represented Lyndel's daughter in adult-abuse proceedings against Thomure and allegedly consulted on Deister's investigation before Judge Lewis appointed him to represent a juvenile officer at the hearing where Woodworth was certified to be tried as an adult.

[5]Woodworth's original defense counsel, Richard McFadin, simultaneously represented another criminal defendant who wrote to Judge Lewis, Hulshof, and the Livingston County grand jury offering evidence that implicated Woodworth, seemingly in exchange for a more lenient sentence.

entities involved in the investigation and prosecution of the case. By the time the district court considered Hulshof's and Judge Lewis's motions for summary judgment, however, they were the only defendants remaining, and there were only two claims left against them. In Count I of the operative complaint, Woodworth asserted that Hulshof and Judge Lewis deprived him of his due-process rights by concealing potentially exculpatory evidence, including the Lewis Letters. In Count IV, Woodworth claimed that Hulshof and Judge Lewis conspired to deprive him of his constitutional rights by agreeing to present false evidence concerning Lyndel's original identification of Thomure as the shooter. The district court granted summary judgment to Hulshof and Judge Lewis on both counts, concluding that Woodworth's theory of the case lacked factual support and that absolute prosecutorial immunity, absolute judicial immunity, and qualified immunity otherwise barred his claims. Woodworth timely appealed.

## II.

"We review de novo the district court's grant of summary judgment, viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party." *Reasonover v. St. Louis Cty.*, 447 F.3d 569, 578 (8th Cir. 2006). A party is entitled to summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Evidence, not contentions, avoids summary judgment," and we may affirm "for any reason supported by the record, even if it differs from the rationale of the district court." *Reasonover*, 447 F.3d at 578-79.

Although most public officials are entitled only to qualified immunity in civil-rights cases, the Supreme Court has recognized that some officials perform "special functions" that merit absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993). In determining whether an official is entitled to absolute immunity, the Court has adopted a "functional approach," looking to "the nature of the function

performed, not the identity of the actor who performed it." *Id.* at 269. Applying this approach, we find both Hulshof and Judge Lewis absolutely immune.

## A.

We first consider Woodworth's claim that the district court erred in granting Hulshof's motion for summary judgment. The Supreme Court has long recognized that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976)). This immunity extends to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom" but not to "administrative duties and those investigatory functions that do not relate to . . . the initiation of a prosecution or for judicial proceedings." *Buckley*, 509 U.S. at 273-74. A prosecutor claiming immunity "bears the burden of showing that such immunity is justified for the function in question." *Id.* at 269. On the record before us, we conclude that Hulshof is entitled to immunity as to the two counts remaining against him.

In Count I, Woodworth alleged misconduct that relates exclusively to Hulshof's role as special prosecutor. He claimed that Hulshof concealed exculpatory evidence, including the Lewis Letters, a chain-of-custody issue related to ballistics evidence, and the conflict of interest involving Woodworth's original defense counsel. As the district court noted, however, *Brady* violations fall within the scope of prosecutorial immunity. *See Imbler*, 424 U.S. at 431 n.34. To the extent Woodworth claims any improprieties unrelated to *Brady*, we have instructed that a prosecutor is immune from suit even if he "knowingly presented false, misleading, or perjured testimony . . . or withheld or suppressed exculpatory evidence." *Reasonover*, 447 F.3d at 580. Thus, prosecutorial immunity bars this count because the conduct alleged was entirely prosecutorial in nature.

-7-

Hulshof is also immune from the conspiracy charge in Count IV. Woodworth alleged that "Hulshof engaged in improper ex parte communication with Judge Lewis and agreed to conceal the letters Lyndel . . . had written to Judge Lewis and to suppress evidence that Lyndel had [initially] 'fingered' [Thomure] as the perpetrator." We previously have held that "a prosecutor is absolutely immune from a civil conspiracy charge when his alleged participation in the conspiracy consists of otherwise immune acts." *See id.* As noted above, the presentation of false testimony and the suppression of evidence are prosecutorial acts that fall within the scope of immunity, *see id.*, and Hulshof's *ex parte* communications with Judge Lewis were likewise "intimately associated with the judicial phase of the criminal process," *see Burns*, 500 U.S. at 486. Thus, the district court correctly found Hulshof immune as to this count as well.

On appeal, Woodworth attempts to sidestep this precedent by arguing that, because Hulshof allegedly entered this conspiracy *before* his appointment as special prosecutor, his actions *at that time* could not have been prosecutorial in nature. Yet, even assuming that immunity does not apply when a prosecutor enters into a conspiracy before being appointed to a case, Woodworth offers nothing but speculation to show that Hulshof participated in a conspiracy, much less that he did so before his appointment. Woodworth makes much of the fact that Judge Lewis's letter to Hulshof refers to "various telephone conversations" the two had prior to Hulshof's appointment. From this, he contends,"[i]t is reasonable to infer that Hulshof and Lewis did not need several 'various' telephone conversations to discuss the simple issue of the AGO's case assignment procedure, but instead had substantive discussions of the facts of the case." We will not make this inferential leap. The only evidence Woodworth points to is Judge Lewis's reference to various pre-appointment conversations with Hulshof, but the mere fact that these conversations occurred is insufficient for a reasonable jury to find the existence of a conspiracy. *See Larson by Larson v. Miller*, 76 F.3d 1446, 1455-56 (8th Cir. 1996) (en banc) (finding no reasonable basis for inferring the existence of a conspiracy, even though defendants

-8-

indisputably met and discussed the allegedly unconstitutional conduct).  Woodworth also suggests that Hulshof's conduct as prosecutor can be used to infer the existence of a prior conspiracy.  However, as the Eleventh Circuit explained in *Rowe v. City of Ft. Lauderdale*, "acts for which a prosecutor enjoys absolute immunity may not be considered as evidence of the prosecutor's membership in a conspiracy for which the prosecutor does not have immunity."  279 F.3d 1271, 1282 (11th Cir. 2002).  Were it otherwise, "the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system would be unduly chilled."[6]  *Id.* (internal quotation marks omitted).

Thus, after examining the record before us, we find that Hulshof is entitled to absolute prosecutorial immunity because the only supported instances of misconduct occurred after he was appointed special prosecutor and were "intimately associated with the judicial phase of the criminal process."  *See Burns*, 500 U.S. at 486.

B.

We next consider Woodworth's argument that the district court erred in granting Judge Lewis's motion for summary judgment.  "[G]enerally, a judge is immune from a suit for money damages."  *Mireles v. Waco*, 502 U.S. 9, 9 (1991) (per curiam).  As the Supreme Court has explained:

---

[6]The three other cases on which Woodworth relies are readily distinguishable because they involve prosecutors acting alongside law enforcement in a purely investigatory role.  *See McGhee v. Pottawattamie Cty.*, 547 F.3d 922, 933 (8th Cir. 2008); *Fields v. Wharrie*, 740 F.3d 1107, 1111-12 (7th Cir. 2014); *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000).  There is no evidence that Hulshof served in such a capacity, for example, by becoming "intensely involved in the [sheriff's] investigation, even though he was not yet assigned any role in the prosecution."  *See McGhee*, 547 F.3d at 926 (internal quotation marks omitted).  Rather, he looked into the case only after his appointment in preparation for grand jury proceedings—a task that falls within the scope of his prosecutorial duties.  *See Buckley*, 509 U.S. at 273.

> Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.

*Id.* at 10 (internal quotation marks omitted). Indeed, "judicial immunity is not overcome by allegations of bad faith or malice." *Id.* at 11. Rather, as we previously have noted, "A judge is immune from suit . . . in all but two narrow sets of circumstances." *Schottel v. Young*, 687 F.3d 370, 373 (8th Cir. 2012). "First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.*

Because Woodworth does not claim that Judge Lewis acted absent jurisdiction, judicial immunity applies unless his alleged conduct involved nonjudicial acts. "An act is a judicial act if it is one normally performed by a judge and if the complaining party is dealing with the judge in his judicial capacity." *Id.* As the Supreme Court has cautioned, conduct does not lose its judicial nature solely because a judge has erred or exceeded his authority. *Mireles*, 502 U.S. at 12. Were it otherwise, the doctrine of judicial immunity would afford only the barest protection. Therefore, to determine whether an act is judicial, we consider "the particular act's relation to a general function normally performed by a judge," not the propriety of the act itself. *Id.* at 13. Based on the conduct alleged in Woodworth's two remaining counts against Judge Lewis, we find the district court correctly concluded that any improprieties on his part qualify as judicial acts.

Judge Lewis was acting pursuant to his role as a judge with respect to the allegations in Count I that he concealed exculpatory evidence—namely, the Lewis Letters and the conflict of interest involving Woodworth's original defense counsel. This claim consists entirely of acts "normally performed by a judge." *See Schottel*,

-10-

687 F.3d at 373. Properly framed, the relevant inquiry is whether Judge Lewis's handling of evidence and his failure to disclose exculpatory evidence fell within the scope of his judicial duties. Judge Lewis came upon the relevant evidence through the judicial acts of appointing a special prosecutor, convening a grand jury, and presiding over a juvenile-certification hearing. His authority to conduct these activities is undisputed. *See State v. Swartz*, 517 S.W.3d 40, 54 (Mo. Ct. App. 2017) (power to appoint a special prosecutor); Mo. Rev. Stat. § 540.021.5 (discretionary authority to convene a grand jury); *id.* § 211.071 (discretionary power to order a juvenile-certification hearing). Further, as the district court noted, the forwarding of correspondence to defense attorneys—or the failure to do so—was likewise a judicial act.[7] We also note that Woodworth does not dispute that he was "dealing with the judge in his judicial capacity" at all relevant times. *See Schottel*, 687 F.3d at 373. Thus, even if true, the allegations in Count I are insufficient to defeat judicial immunity.

Similarly, Woodworth's conspiracy claim in Count IV involved only judicial acts. Specifically, he claimed that "[c]ircumstances indicate . . . Lewis recruited Hulshof, and Hulshof agreed to join the conspiracy by presenting a false version of the facts." But again, the process of appointing a special prosecutor falls squarely within a judge's duties. *See Swartz*, 517 S.W.3d at 54. Further, like the parallel conspiracy charge against Hulshof, there is no evidence to support the claim that Judge Lewis participated in a conspiracy extending beyond his official role, for unsubstantiated "[a]llegations of conspiracy between judge and prosecutor to predetermine the outcome of a judicial proceeding are insufficient to overcome th[eir

---

[7]To the extent Woodworth suggests that the concealment of evidence does not qualify as a judicial act, applicable precedent forestalls this framing of alleged judicial misconduct. *See, e.g.*, *Mireles*, 502 U.S. at 12 (explaining that, if the judicial-act inquiry were limited to particular acts of misconduct, "then any mistake of a judge . . . would become a 'nonjudicial' act, because an improper or erroneous act cannot be said to be normally performed by a judge").

respective] immunities." *See Ashelman v. Pope*, 793 F.2d 1072, 1079 (9th Cir. 1986) (en banc); *see also Moses v. Parwatikar*, 813 F.2d 891, 893 (8th Cir. 1987) ("Clearly a judge who conspires to violate a person's constitutional rights acts maliciously or corruptly.  However, the need to preserve the judge's independence requires a grant of absolute immunity.").  Therefore, Judge Lewis is entitled to judicial immunity for this count, as well.

On appeal, Woodworth attempts to avoid judicial immunity by identifying two purportedly nonjudicial acts undertaken by Judge Lewis.  First, Woodworth claims that Judge Lewis "abandoned his duty to act as an impartial tribunal and assumed the role of a prosecutor."  As support, he cites the following section of the special master's report:

> Caught up in his quarrel with Prosecutor Roberts, Judge Lewis lost sight of his judicial sense of fairness.  In effect, he became a prosecutor.  He analyzed the crimes with which to charge Woodworth and the Statutes of Limitation for those crimes; he called a grand jury based upon an ex parte letter that he got from one of the victims . . . ; he gratuitously criticized Roberts before the grand jury, setting an improper tone for a fair grand jury process; he appointed a grand jury forem[a]n with whom he had, at a minimum, a prior business relationship; he presided over the juvenile certification hearing wherein the Juvenile Officer was represented by an attorney who, at the same time, personally represented him; and, then, when disqualified, he designated the judge who would ultimately presided [sic] over the ensuing trials.

Seizing on this passage, Woodworth argues that Judge Lewis forfeited judicial immunity by virtue of assuming the role of prosecutor.

Yet the report's conclusion cannot be taken as literally as Woodworth suggests. We discern only two acts in the above excerpt that are even remotely prosecutorial in nature:  (1) identifying potential charges and (2) calculating the relevant statutes of limitations.  But Judge Lewis took both steps to apprise Hulshof of the status of the

-12-

case; the determinations were in no way binding on Hulshof, nor did they guarantee that a prosecution would follow. Thus, Judge Lewis cannot be said to have effectuated a prosecution. This is a far cry from the conduct at issue in *Lopez v. Vanderwater*, 620 F.2d 1229 (7th Cir. 1980)—the lone case Woodworth cites rejecting a claim of judicial immunity. In *Lopez*, a judge detained one of his former rental-property tenants at gunpoint, had him arrested, wrote out charges against him, completed a plea-waiver form and entered a guilty plea without his consent, and then sentenced him to 8 months' imprisonment. *See id.* at 1231-33. Notwithstanding this brazen conduct, the Seventh Circuit found the judge immune as to the arraignment, conviction, and sentencing of the former tenant. However, it held that he was ineligible for immunity as to his "prosecutorial acts," which included the decision to initiate charges and the completion of a charging form. *Id.* at 1235-37. As the Eleventh Circuit later explained in distinguishing *Lopez*, the key to the partial loss of immunity in that case was that the landlord-judge "initiated charges not as a result of a case brought before [him] by the parties, but as a result of events in [his] private, nonjudicial li[fe], events in which [he] had a personal stake." *See Harris v. Deveaux*, 780 F.2d 911, 915 (11th Cir. 1986). Here, the mere involvement of Judge Lewis's personal attorney, which may be sufficient to create a conflict of interest, is not a personal, financial stake of the sort involved in *Lopez*. More importantly, it was Hulshof—not Judge Lewis—who was solely responsible for formulating and filing charges. Thus, Woodworth's judge-as-prosecutor theory fails because Judge Lewis did not formally act as a prosecutor like the landlord-judge in *Lopez*.

In a second attempt to overcome the district court's finding of judicial immunity, Woodworth emphasizes that Judge Lewis's *ex parte* communications with Lyndel, Hulshof, and Judge Lewis's personal attorney violated the Code of Judicial Ethics. However, Woodworth does not claim that these conversations pertained to matters disconnected from Judge Lewis's duties as a judge, and the *ex parte* nature of a communication does not transform it into a nonjudicial act, even where such communications constitute a breach of professional ethics rules. *See Nystedt v. Nigro*,

-13-

700 F.3d 25, 31-32 (1st Cir. 2012); *Dellenbach v. Letsinger*, 889 F.2d 755, 761-62 (7th Cir. 1989).

Therefore, on the record before us, we see no basis for reversing the grant of summary judgment to Judge Lewis. Any evidence of misconduct relates directly to his official role as a judge, and as a result, he is entitled to the absolute immunity accorded to that office.

## III.

Accordingly, we affirm the grant of summary judgment because absolute immunity bars Woodworth's claims against both Hulshof and Judge Lewis.

_____