Robert F. SCOTT, Plaintiff,

v.

**CENTRAL MAINE POWER COMPANY,
et al., Defendants.**

Civ. No. 85–0187 B.

United States District Court,
D. Maine.

March 13, 1989.

Richard E. Poulos, John S. Campbell, for plaintiff.

John H. Montgomery, Merton G. Henry, Brian C. Shaw, Jensen Baird Gardner & Henry, Portland, Me., for defendant Thurlow.

Cabanne Howard, Asst. Atty. Gen., Augusta, Me., for defendants Bradford and Moskovitz.

Charles A. Harvey, Michael T. Healy, Portland, Me., for defendants Central Maine Power, Ellis, Russell, Gorman, Titcomb, Dufour & Reed.

David T. Flanagan, Cent. Maine Power Co., Augusta, Me., for Cent. Maine Power Co.

## MEMORANDUM AND ORDER

CYR, Chief Judge.

Defendants Bradford and Moskovitz move to dismiss on the ground that they are absolutely immune from suit and, therefore, that the amended complaint fails to state a claim on which relief can be granted under 42 U.S.C. § 1983. Plaintiff objects to the United States Magistrate's recommendation that the motion to dismiss be granted, *see Scott v. Central Maine Power Company*, Civil No. 85–0187–B, Recommended Disposition of Motion of Defendants Bradford and Moskovitz to Dismiss (D.Me. June 8, 1987), and the court undertakes *de novo* review, *see* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b).

### I. BACKGROUND

The allegations of the amended complaint are considered true for present purposes.[1] *See Kay v. New Hampshire Democratic Party*, 821 F.2d 31, 33 n. 3 (1st Cir.1987).

At all relevant times Bradford was the Chairman of the Maine Public Utilities Commission (MPUC). Moskovitz was an MPUC staff attorney from 1978 through 1983 and became a commissioner of the MPUC in February 1984. Plaintiff Scott began working at Central Maine Power Company (CMP) in 1953 and became a vice president in 1974; Senior Vice President in

---

1. As permitted by rule 12(b), *see* Fed.R.Civ.P. 12(b), the Magistrate excluded from consideration matters outside the pleadings, which was entirely appropriate particularly in light of the purposes to be served by the immunity doctrine. *See Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987)

"One of the purposes of [the immunity doctrine] is to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'" (Citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982)).

1977; and a member of the Board of Directors in September 1978.

On August 5, 1982, the MPUC issued an order requiring CMP to submit a proposed conservation loan program in accordance with the Maine Electric Rate Reform Act, Me.Rev.Stat.Ann. tit. 35 §§ 91 *et seq.* At a September 23, 1982 hearing on the proposed conservation loan program, Scott, who was CMP's principal witness, falsely testified that a March 1982 survey (which CMP management wished to keep confidential) had been destroyed. Although part of the March 1982 survey related to CMP customer attitudes toward a conservation loan program, the survey also requested CMP customers' views on unrelated matters. At the September 23 hearing, Scott provided the MPUC with all of the survey information relating to the conservation loan program.

During a recess in the hearing, Moskovitz advised Douglas Stevenson, a CMP employee, that he did not believe Scott's testimony that the March 1982 survey had been destroyed. Faced with the MPUC's belief that the March 1982 survey was retrievable, CMP management, including Scott, CMP President Elwin W. Thurlow and others, endeavored to preserve the confidentiality of the survey. On October 7, 1982, Scott provided the MPUC with an edited version of an executive summary of the survey.

On October 8, 1982, Moskovitz launched an investigation into the truthfulness of the testimony given by Scott at the conservation loan program hearing. An Ad Hoc Committee of the CMP Board of Directors was formed to determine, coordinate and direct CMP's legal position in regard to the MPUC investigation and to conduct CMP's own investigation. The Ad Hoc Committee suspended Scott, with pay, on October 12, 1982.

On October 15, 1982, the MPUC officially notified CMP and Scott of its formal investigation. Specifically, the MPUC notice stated:

[T]he Commission is initiating a formal investigation under 35 M.R.S.A. § 296 with respect to whether there was an effort to withhold information from the Commission, who was responsible, and what actions should be taken by the Commission in response to the findings which may be made as a result of this investigation.

Amended Complaint, at ¶ 52. The investigation had been requested informally by Bradford, who had learned from Moskovitz about Scott's supposedly false testimony.

In addition to requesting an MPUC investigation, Bradford urged the Maine Attorney General to indict Scott for perjury. During November 1982, the Attorney General's Office interviewed Scott, Thurlow and others concerning the alleged CMP cover-up. On December 2, 1982, the Attorney General's Office determined that Scott would not be prosecuted for perjury. In response, Bradford wrote to the Attorney General:

I understand from David Moskovitz that Jim Brannigan stated that I do not disagree with the proposition that Bob Scott's false statements were not material to the Conservation Loan Program case.

There is a misunderstanding of some sort here. Jim Brannigan and I did not discuss materiality. The Commission's position, as reiterated by David Moskovitz on several occasions, was that Mr. Scott's false statement could well have influenced the course of the proceeding. We would be glad to provide testimony to that effect.

Amended Complaint, at ¶ 57.

The Maine Attorney General instead prosecuted Scott for "false swearing," a misdemeanor under Me.Rev.Stat.Ann. tit. 17–A, § 452,[2] and, on December 13, 1982, Scott pleaded guilty pursuant to a plea agreement with the Attorney General which provided that Scott would not be prosecuted for any other crime arising out of his false testimony before the MPUC.

---

**2.** False swearing is a class D crime, punishable by imprisonment for less than one year, *see* Me.Rev.Stat.Ann. tit. 17–A, §§ 452, 1252, where-

as perjury is a class C crime, punishable by up to five years in prison, *see* Me.Rev.Stat.Ann. tit. 17–A, §§ 451, 1252.

Scott was fined $500. Bradford was openly critical of the sentence.

The MPUC investigation intensified upon the scheduling of a series of depositions beginning in late December 1982. The MPUC retained Peter L. Murray, Esquire, an attorney having numerous business and social contacts with Bradford, to assist Moskovitz with the depositions. Murray had acted on at least one occasion as Bradford's personal attorney. Depositions of Scott, Thurlow and other CMP personnel were conducted from December 1982 through February 1983.

On January 11, 1983, the MPUC further clarified the scope of its formal investigation:

> [The notice of investigation] places the reasonableness of the Company's actions (including all of its directors, officers, employees, and outside counsel and consultants) before, during, and after Mr. Scott's September 23, 1982 testimony within the scope of the Commission's investigation.
>
> An understanding of CMP's polling practices, the purposes of the polls, the dissemination of the results, and their relationship to any effort to withhold information from the Commission is a necessary adjunct to a full understanding of this matter and is within the scope of this investigation.

*See* Amended Complaint, at ¶ 62.

On January 21, 1983, Moskovitz notified CMP that "the risk of criticism by [the MPUC] would be 'increased by inaction or actions [by CMP] designed to satisfy the minimal concerns of the Commission, while not fully addressing the situation.'" Amended Complaint, at ¶ 67. In response to the Moskovitz letter, the CMP Ad Hoc Committee met, with Thurlow present, and discussed possible corrective measures by CMP. On February 3, 1983, Thurlow wrote the MPUC that Scott would be demoted to a non-policymaking position at one-half salary; that Scott would retire when he became eligible in two years; and that Thurlow himself would retire within three years.

On February 3 or 4, Bradford publicly stated that CMP's proposed measures were "not the end of the matter." On February 11, 1983, Bradford indicated that the MPUC probably would have taken no further steps against CMP had CMP apologized for Scott's false testimony shortly after the September 23 hearing.

The MPUC staff issued a preliminary investigation report on February 14, 1982, recommending, *inter alia*, that the MPUC find Scott guilty of contempt. The Maine media carried the MPUC report, which concluded that CMP officials had covered up Scott's false testimony.

On February 17, 1982, after meeting to discuss the MPUC preliminary report, the Ad Hoc Committee instructed the CMP lawyers to meet with Moskovitz and Murray to discuss measures to placate the MPUC to the point that the Scott investigation could be terminated. Unbeknown to Scott and his counsel, the CMP lawyers met that same day with Moskovitz and Murray at Brunswick, Maine. At that meeting, Moskovitz stated that in order to resolve the controversy Scott and another CMP official would have to be fired, a third CMP official would have to be reprimanded and Thurlow would have to retire sooner than proposed. The meeting reached an impasse.

The next day Moskovitz conferred with Bradford and another MPUC commissioner about the Brunswick meeting with the CMP lawyers. [Later, on March 16, 1983, after Scott objected to Moskovitz' *ex parte* communications with Bradford, Bradford denied that he and Moskovitz had discussed matters pertaining to Scott.] Immediately following the meeting with Bradford, Moskovitz informed the CMP lawyers that the Brunswick meeting was to be considered a "non-event" and that he and Murray had been instructed not to discuss a resolution of the Scott investigation with CMP counsel.

On February 19, after the CMP lawyers had reported on their Brunswick meeting with Murray and Moskovitz, the Ad Hoc Committee decided to discharge Scott, effective March 1, 1983. On February 22,

the Ad Hoc Committee advised Bradford that Scott had been fired and that Thurlow's resignation would be accelerated.

On May 11, the MPUC staff, *CMP and Scott stipulated* the record in the MPUC investigation, *so that the MPUC could issue a decision without a public hearing.* See 65–407 C.M.R. Chapter 11, § 6(G)(2). On July 22, the MPUC issued a proposed decision concluding that contempt citations should issue against Scott, Thurlow, a third CMP official, and CMP. The MPUC issued its final decision on September 21, 1983, determining not to pursue contempt charges against any individual, and it accepted CMP's plea of *nolo contendere* upon payment of a $20,000 fine.

Scott sought employment by the State of Maine in March 1983 following his discharge by CMP. George Vilas, Director of Planning and Operations of the State of Maine, Department of Personnel, interviewed Bradford concerning Scott's application for employment. Bradford advised Vilas that although Scott had pleaded guilty to state charges of false swearing, contempt charges were still pending against Scott before the MPUC. Bradford further stated that Scott had not reasonably explained the events relating to the March 1982 survey, and he referred to Scott as a "felon" who had not undergone sufficient rehabilitation to regain public respect and trust.

## II. CLAIMS FOR RELIEF

Count I of the amended complaint alleges that Bradford, acting under color of state law as the Chairman of the MPUC, severely damaged Scott and deprived Scott of due process in violation of 42 U.S.C. § 1983. Scott complains that his discharge by CMP was intentionally caused by Bradford. Scott contends that Bradford injured him by failing to conduct an impartial hearing as required by Me.Rev.Stat.Ann. tit. 5, § 9063(1) and Rule 7E of the MPUC Rules of Practice and Procedure. Scott specifically alleges that Bradford: (1) appointed or permitted attorneys, including Moskovitz, to investigate Scott even though Bradford knew or should have known that those attorneys were biased against Scott and that they had conflicts of interest; (2) presided over the Scott investigation, despite personal bias and prejudice against Scott; (3) engaged in *ex parte* communications in connection with the Scott investigation; (4) acted beyond the scope of his authority by threatening and charging Scott with civil and/or criminal contempt and by attempting to interfere with the criminal law enforcement process against Scott; and (5) defamed Scott.

Count II alleges that Moskovitz, acting under color of state law as the MPUC staff attorney in charge of the Scott investigation, deprived Scott of due process in violation of 42 U.S.C. § 1983. Scott contends that Moskovitz severely damaged him by (1) accepting appointment to the Scott investigation, despite having elicited the false testimony from Scott at the September 23, 1982 hearing and having made the initial accusation against Scott; (2) violating Maine Bar Rules 3.2(d)(2), 3.6(d) and 3.7(h)(2); and (3) engaging in *ex parte* communications with the MPUC. Scott alleges that Moskovitz' actions caused Scott's discharge by CMP.

Count XXI alleges that Bradford defamed Scott during his May 27, 1983 interview with George Vilas and during a subsequent interview with Nancy M. Davis, a reporter for the nationally published magazine *State Legislatures.* Scott also alleges that Bradford made defamatory statements about Scott following the commencement of the present action.

Count XXII alleges that Bradford interfered with Scott's potentially advantageous relationship with the State of Maine, in violation of Maine law, by defaming Scott during Bradford's May 27, 1983 interview with George Vilas. He alleges that the State of Maine denied him employment as a result of Bradford's statements.

## III. DISCUSSION

Relying primarily on *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), Moskovitz argues that he is entitled to absolute *prosecutorial* immunity from suit under section 1983; Bradford contends

that he is protected by absolute *judicial* immunity. Alternatively, the defendants claim that Scott has failed to state a cognizable claim under section 1983.

### A. *The Doctrine of Absolute Judicial Immunity*

*Butz* was a *Bivens* action brought by a commodity futures commission merchant against various officials of the United States Department of Agriculture for their participation in an administrative proceeding allegedly brought in retaliation for the plaintiff's criticism of the Department of Agriculture. The complaint in *Butz* charged that the administrative complaints against the plaintiff had been issued without notice and had been furnished to "interested persons," and that the defendants issued press releases containing false statements about the plaintiff. The defendants interposed their affirmative defense of absolute immunity.

The Supreme Court stated that "[a]lthough a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations, our decisions recognize that there are some officials whose special functions require a full exemption from liability." *Butz*, 438 U.S. at 508, 98 S.Ct. 2911 (citing *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

Judges constitute one category of public officials traditionally given absolute immunity from private actions for damages, even those alleging that a judge has acted with improper or malicious motives. *See Butz*, 438 U.S. at 508–509, 98 S.Ct. at 2911–12; *see also Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 543, 98 L.Ed.2d 555 (1988). The Court explained that "[j]udges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities." *Butz*, 438 U.S. at 511, 98 S.Ct. at 2913.

[T]he safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges.

*Butz*, 438 U.S. at 512, 98 S.Ct. at 2914 (footnote omitted). The Supreme Court recognized, "[a]s early as 1872 ... that it was 'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself.'" *Stump v. Sparkman*, 435 U.S. 349, 355, 98 S.Ct. 1099, 1104, 55 L.Ed. 2d 331 (1978) (citation omitted).

Two conditions must be met before judicial immunity can attach. "First, the act must not have been taken in the 'clear absence of all jurisdiction.' ... Second, the act must be a 'judicial act.'" *Lopez v. Vanderwater*, 620 F.2d 1229, 1233 (7th Cir.) (quoting *Stump*, 435 U.S. at 357, 360, 98 S.Ct. at 1105, 1106), *cert. dismissed*, 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980); *see also Decker v. Hillsborough County Attorney's Office*, 845 F.2d 17, 21 (1st Cir.1988); *Houghton v. Osborne*, 834 F.2d 745, 750 (9th Cir.1987).

In determining whether a judge has acted in the clear absence of all jurisdiction, "the scope of the judge's jurisdiction must be construed broadly...." *Stump*, 435 U.S. at 356, 98 S.Ct. at 1104; *see also Holloway v. Walker*, 765 F.2d 517, 523 (5th Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 605, 88 L.Ed.2d 583 (1985). "[T]he fact that the power to take a given action is not expressly included in a judge's jurisdiction ... is less significant than the fact that it is not expressly excluded from that jurisdiction." *Lopez v. Vanderwater*, 620 F.2d at 1233 n. 4; *see also Stump*, 435 U.S. at 358, 98 S.Ct. at 1105. Moreover, "[a] judge does not lose immunity because an action is erroneous, malicious, in excess of his authority, or disregardful of elementary principles of procedural due process, as long as

the judge had jurisdiction over the subject matter before him." *Decker,* 845 F.2d at 21 (citing *Stump,* 435 U.S. at 356, 359–60, 98 S.Ct. at 1104, 1106–07); *see also Sullivan v. Kelleher,* 405 F.2d 486, 487 (1st Cir.1968) ("The distinction which must be observed is 'between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter.' ") (quoting *Bradley v. Fisher,* 80 U.S. (13 Wall.) at 351).

Under the second criterion for assessing the applicability of absolute judicial immunity,

> the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his official capacity.

*Stump,* 435 U.S. at 362, 98 S.Ct. at 1107. The fact that *a judge*[3] acts informally, outside the courtroom and without observance of procedural requirements, or engages in *ex parte* communications, does not strip *a judge* of absolute immunity. *Stump,* 435 at 361–63, 98 S.Ct. at 1107–08; *see also Forrester,* 108 S.Ct. at 544; *Cleavinger v. Saxner,* 474 U.S. 193, 200, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985). On the other hand, one commentator has observed that quasi-judicial immunity "appear[s] limited to participants in 'formal agency adjudication,' and likely will not be extended to 'informal adjudication,' which typically involves 'a wide spectrum of conferences, discussions and settlements outside the framework of a formal hearing.' " *Ward v. Johnson,* 690 F.2d 1098, 1105 (4th Cir.1982) (*en banc*) (quoting The Supreme Court, 1977 Term, 92 Harv.L.Rev. 5, at 269–70 n. 35).

The Supreme Court has been careful to focus on the *functions* protected by absolute immunity, more than on the person or position protected by judicial immunity. *See Forrester,* 108 S.Ct. at 544. "The decided cases ... suggest an intelligible distinction between judicial acts and the administrative, legislative or executive functions that judges may on occasion be assigned by law to perform." *Id.* Thus, a judge is not entitled to *judicial* immunity when, for example, he discharges a subordinate, *see Forrester,* 108 S.Ct. at 544 (qualified immunity at most), selects jurors, *see Ex Parte Virginia,* 100 U.S. (10 Otto) 339, 348, 25 L.Ed. 676 (1880) (no immunity), or promulgates a code of conduct for attorneys, *see Supreme Court of Virginia v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980) (legislative immunity).[4]

*Butz* extended absolute judicial immunity to certain adjudicative functions performed by federal agency officials. "[A]djudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Butz,* 438 U.S. at 513, 98 S.Ct. at 2914. Justice White noted that the Administrative Procedure Act, *see* 5 U.S.C. § 551 *et seq.,* provides safeguards comparable to those accorded in judicial settings.

> The proceedings are adversary in nature. See 5 U.S.C. § 555(b) (1976 ed.). They are conducted before a trier of fact insulated from political influence. See § 554(d). A party is entitled to present his case by oral or documentary evidence, § 556(d), and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision. § 556(e). The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record. § 557(c).

---

**3.** Of course, a preliminary question in the present case is whether Bradford is a "judge" or the functional equivalent. *See Butz,* 438 U.S. at 513, 98 S.Ct. at 2914; *Stump,* 435 U.S. at 362, 98 S.Ct. at 1107.

**4.** In *Forrester,* the Court noted that the unavailability of absolute immunity for judges in their administrative decisions regarding employment of court personnel "does not imply that qualified immunity, like that available to executive branch officials who make similar discretionary decisions, is unavailable to judges for their [non-judicial] employment decisions." 108 S.Ct. at 545.

*Id.* at 513, 98 S.Ct. at 2914. Moreover, a federal hearing examiner or administrative law judge performs a role comparable to that of a judge.

His powers are often, if not generally, comparable to those of a trial judge: He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. See § 556(c). More importantly, the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency.... [T]he Administrative Procedure Act contains a number of provisions designed to guarantee the independence of hearing examiners. They may not perform duties inconsistent with their duties as hearing examiners. 5 U.S.C. § 3105 (1976 ed.). When conducting a hearing under § 5 of the APA, 5 U.S.C. § 554 (1976 ed.), a hearing examiner is not responsible to, or subject to the supervision or direction of, employees or agents engaged in the performance of investigative or prosecution functions for the agency. 5 U.S.C. § 554(d)(2) (1976 ed.). Nor may a hearing examiner consult any person or party, including other agency officials, concerning a fact at issue in the hearing, unless on notice and opportunity for all parties to participate. § 554(d)(1).

*Id.* at 513–14, 98 S.Ct. at 2914–15.

The importance of these safeguards in evaluating a claim of absolute immunity was underscored in *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), where two federal prison inmates brought a *Bivens* action against the members of the prison Institution Discipline Committee. Prison rules accorded inmates certain procedural safeguards.

Among these were the right to have a written copy of the charge; the right to have a member of the prison staff represent him; the rights, except where institutional safety would be jeopardized, to be present at the hearing, to call witnesses, and to submit documentary evidence; and the right to receive a written explanation of the committee's decision.

*Id.* at 195, 106 S.Ct. at 498. The disciplinary proceeding was to be conducted by a committee of two persons at the department-head level and a third prison staff member, none of whom could be the reporting officer, investigating officer or a witness to the incident, unless virtually every available person had witnessed the incident. *Id.* at 195–96 n. 3, 106 S.Ct. at 497–98 n. 3. Thus, the Court observed that

[t]he committee members, in a sense, do perform an adjudicatory function in that they determine whether the accused inmate is guilty or innocent of the charge leveled against him; in that they hear testimony and receive documentary evidence; and in that they render a decision.

*Id.* at 203, 106 S.Ct. at 502.

Nontheless, the Court held that the members of the discipline committee were not entitled to absolute immunity.

We do not perceive the discipline committee's function as a "classic" adjudicatory one, as petitioners would describe it. Tr. of Oral Arg. 9–10. Surely, the members of the committee, unlike a federal or state judge, are not "independent"; to say that they are is to ignore reality. They are not professional hearing officers, as are administrative law judges. They are, instead, prison officials, albeit no longer of the rank and file, temporarily diverted from their usual duties. See *Ward v. Johnson,* 690 F.2d [1098] at 1115 [CA4 1982] (dissenting opinion). They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate. They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee. See *Ponte v. Real,* 471 U.S. 491, 513, [105 S.Ct. 2192, 2204, 85 L.Ed.2d 553] (1985) (dissenting opinion). It is the old situational problem of the

relationship between the keeper and the kept, a relationship that hardly is conducive to a truly adjudicatory performance. *Id.* at 203–04, 106 S.Ct. at 502–03.

The Court disclaimed any similarity between the discipline committee and the traditional parole board, which is "a 'neutral and detached' hearing body" serving "essentially 'as an arm of the sentencing judge.'" *Id.* at 204, 106 S.Ct. at 502 (citing *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972)); *see also Sellars v. Procunier,* 641 F.2d 1295, 1302 n. 15 (9th Cir.) (parole board officials absolutely immune from suit for damages), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981). Rather, the Court compared discipline committee members to school board members, who were denied absolute immunity in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), despite their role as "'adjudicators in the school disciplinary process,'" acting on alleged violations of school regulations and the appropriate sanctions to be imposed. *Cleavinger,* 474 U.S. at 204, 106 S.Ct. at 502.

Finally, *Cleavinger* notes that the procedural safeguards of the Administrative Procedure Act, as discussed in *Butz,* for the most part were unavailable in the prison disciplinary process.

> The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of

the kind and depth that has occasioned absolute immunity.

*Id.* at 206, 106 S.Ct. at 503.

"The line between absolute and qualified immunity often is not an easy one to perceive and structure." *Id.* at 206, 106 S.Ct. at 503; *see also Scott v. Schmidt,* 773 F.2d 160, 163–64 n. 4 (7th Cir.1985). Several federal courts have extended quasi-judicial immunity to state administrative officials engaged in adjudicatory functions.[5] *See, e.g., Horwitz v. State Board of Medical Examiners,* 822 F.2d 1508 (10th Cir.) (absolute immunity of state medical examiners), *cert. denied,* —— U.S. ——, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987); *Johnson v. Rhode Island Parole Board Members,* 815 F.2d 5 (1st Cir.1987) (absolute immunity of state parole board members); *Scott v. Schmidt,* 773 F.2d 160 (7th Cir.1985) (absolute immunity of Illinois Racing Board members issuing, suspending and denying licenses); *Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir.1983) (absolute immunity of local liquor control commissioner); *Jones v. Coughlin,* 665 F.Supp. 1040 (S.D.N.Y.1987) (absolute immunity of state parole board members). *But cf. Mary and Crystal v. Ramsden,* 635 F.2d 590 (7th Cir.1980) (no absolute immunity for member of state juvenile detention camp disciplinary committee); *Williams v. City of Montgomery,* 742 F.2d 586, 589–90 (11th Cir.1984) (no absolute or qualified immunity for city-county personnel board), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985).

### 1. *Defendant Bradford*

The first inquiry in the present action is whether defendant Bradford's actions were taken in the clear absence of all jurisdiction. Bradford argues that the MPUC's investigation and its administrative proceedings against Scott were within the MPUC's jurisdiction under Me.Rev.Stat.

---

**5.** The *Butz* and *Cleavinger* holdings are not limited to federal officials. In *Butz,* the Court spoke at length about the need for parity in immunizing state and federal officials from constitutional claims. The Court held that "there is no basis for according to federal officials a higher degree of immunity for liability when sued for a constitutional infringement as authorized by *Bivens* than is accorded state officials

when sued for the identical violation under § 1983." *Butz,* 438 U.S. at 500, 98 S.Ct. at 2907. *See also Marrero v. City of Hialeah,* 625 F.2d 499, 507 (5th Cir.1980) (holding that "the logical converse is also true: there is no reason for according to state officials a higher degree of immunity...."), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981).

Ann. tit. 35, §§ 294, 296 & 352 (repealed and replaced by Me.Rev.Stat.Ann. tit. 35–A, §§ 1306, 1303 & 1502 (1988)). Section 296 authorized the MPUC to conduct an investigation if it believed that "[a]n investigation of any matter relating to any public utility should for any reason be made." On a finding that a practice is "unjust, unreasonable, insufficient or unjustly discriminatory," section 294 authorized the MPUC to "establish or substitute therefor such other ... practice, service or acts, and to make such order ... and such changes ... as shall be just and reasonable." Section 352 authorized the MPUC to impose penalties for contempt for noncompliance with any "order, decision, rule, direction, demand or requirement."

Relying primarily on *Berry v. Maine Public Utilities Commission,* 394 A.2d 790 (Me.1978), Scott contends that Bradford's actions were clearly beyond the jurisdiction of the MPUC. In *Berry,* the Law Court vacated an order entered by the MPUC in a section 296 investigation because the MPUC exceeded its authority in its conduct of a public hearing during the investigation and violated governing rules of evidence. *See* 394 A.2d at 792. There the Law Court observed that "[t]he Commission's power to conduct investigations under § 296 is a broad one, extending to '*any matter relating to any public utility....*'" 394 A.2d at 792–93 (emphasis in original). *See also Central Maine Power Co. v. Public Utilities Commission et al.,* 395 A.2d 414, 430 (Me.1978) (same); Me.Rev.Stat.Ann. tit. 35, § 4 (1978) (repealed and replaced by Me. Rev.Stat.Ann. tit. 35–A, § 112 (1988)). Thus, the Law Court's description of the *scope* of the MPUC's investigatory jurisdiction, as distinguished from the restrictions upon the *exercise* of its subject matter jurisdiction, is as broad as the language of the enabling statute. *Cf. Maine Public Service Co. v. Public Utilities Commission,* 524 A.2d 1222 (Me.1987) (MPUC lacks *authority* to compel a utility to pursue a merger with another utility); *Central Maine Power Co. v. Public Utilities Commission,* 395 A.2d at 429 ("... two-part inquiry: Was the subject matter of the investigation within the scope of ... § 296? If so, did the Commission have the statutory authority to compel CMP to respond to the data requests?").

In considering whether Bradford's actions in connection with the section 296 proceedings were "judicial acts" clothed with absolute immunity, *Butz* and *Cleavinger* counsel that attention must focus on the safeguards available in such proceedings. Some of the safeguards available once a section 296 investigation has proceeded to the adjudicatory proceeding stage were described in *Berry v. Maine Public Utilities Commission,* 394 A.2d at 792–93 (emphasis in original):

> The Commission's power to conduct investigations under § 296 is a broad one, extending to "*any matter relating to any public utility,*" and such investigation may be made "*summarily*". However, when the investigatory phase advances to the point where a "*formal public hearing*" is warranted, respect must be shown for the rights of persons who are the subject of that investigation. When a hearing is to be had, 35 M.R.S.A. § 297 provides that
>
> > *Notice ... shall be given ... as provided in section 293; and thereafter proceedings shall be had and conducted ... as though complaint had been filed with the commission....*

At the time alleged in the amended complaint, section 293 provided:

> The commission shall give notice of the time and place when and where the formal public hearing will be held, as provided in Title 5, section 9052. The commission shall have authority to issue subpoenas to require the attendance and testimony of witnesses and the production of any evidence relating to any fact at issue in the hearing. Any party to a hearing shall be entitled to be heard and to have the subpoenas issued by the commission in the manner described in Title 5, section 9060.

Me.Rev.Stat.Ann. tit. 35, § 293 (1984 Supp.) (repealed and replaced by Me.Rev.Stat.

Ann. tit. 35–A, § 1304 (1988)).[6] In addition, Me.Rev.Stat.Ann. tit. 35, § 308 (1978) (repealed and replaced by Me.Rev.Stat.Ann. tit. 35–A, § 1311 (1988)) made the Maine Rules of Civil Procedure and the Maine Rules of Evidence applicable in MPUC proceedings. Judicial review was available under Me.Rev.Stat.Ann. tit. 35, § 303 (1978) (repealed and replaced by Me.Rev.Stat. Ann. tit. 35–A, § 1320 (1988)) and 305 (1978) (repealed by Laws 1985, c. 663, § 3), which permitted a Law Court appeal from final decisions of the MPUC, including an appeal challenging the constitutionality of MPUC orders. Another avenue of judicial review was afforded by Me.Rev.Stat.Ann. tit. 5, § 11007(4)(C) [Maine Administrative Procedure Act], which provides for reversal or modification of agency action—

if the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by bias or error of law;

(5) Unsupported by substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion.

The role of the commissioners, including defendant Bradford, in MPUC investigatory proceedings was defined by Me.Rev. Stat.Ann. tit. 35, § 299 (1978) (repealed and replaced by Me.Rev.Stat.Ann. tit. 35–A, § 1305 (1988)), which provided:

Each of the commissioners, for the purposes mentioned in chapters 1 to 17, may hold hearings and conduct investigations, administer oaths, certify to official acts, issue subpoenas, compel the attendance of witnesses and the production of books, accounts, papers, documents and testimony, punish by fine and imprisonment for contempt and issue all processes necessary to the performance of the duties of the commission. Said commission shall have power to appoint, to serve during its pleasure, examiners, who, being first duly sworn, shall have authority to administer oaths, examine witnesses, issue subpoenas, require the production of books, accounts, papers, documents and testimony, and receive evidence in any matter under the jurisdiction of the commission, and shall perform such other duties as may be assigned to them. Evidence so taken and received shall have the same force and effect as though taken and received by said commission and shall authorize action by said commission as though by it taken and received. When objection is made to admissibility of evidence, examiners authorized to practice before the Supreme Judicial Court shall rule on the admissibility of evidence in accordance with the practice and rules of evidence in civil actions in the Superior Court. The commission shall fix the salary of said examiners. Either the examiner or the commissioner, who is the presiding officer at said hearing, shall at the outset of said hearing inform the public as to the steps necessary to preserve their right to appeal the final order or decision of the commission to the Supreme Judicial Court under the provisions of sections 303 and 305.

The Maine Administrative Procedure Act provided additional safeguards. Me.Rev. Stat.Ann. tit. 5, section 9063 requires that administrative hearings be conducted in an impartial manner, free from bias on the part of the presiding officer or agency members involved in the proceeding. In addition, Me.Rev.Stat.Ann. tit. 5, section 9055 prohibits *ex parte* communications between the decisionmaking and prosecuting personnel of a state agency. *See also Berry*, 394 A.2d at 793 (noting, in the context of a section 296 proceeding, the impropriety of *"ex parte* communications between [a] commissioner and a staff attorney in-

---

**6.** The section now states: "The Commission shall notify the public utility and other interested persons it considers proper of the time and place of the formal public hearing as provided in Title 5, section 9052." Me.Rev.Stat.Ann. tit. 35–A, § 1304(1) (1988). The section continues to entitle a party to be heard and to issue subpoenas. *See* Me.Rev.Stat.Ann. tit. 35–A, §§ 1304(3), (4).

consistent with their respective roles as judge and advocate.")

The MPUC Rules of Practice and Procedure [MPUC Rules] provide that the safeguards applicable to a formal hearing *become available upon the issuance of a notice of formal investigation in a section 296 proceeding.* 65–407 C.M.R. Chapter 11, § 6(A)(1)(b). The MPUC Rules define an adjudicatory proceeding as "any proceeding before the Commission in which the legal rights, duties or privileges of specific persons are required by constitutional law or statute to be determined after an opportunity for hearing." 65–407 C.M.R. Chapter 11, § 6(A)(1). Adjudicatory proceedings include proceedings under section 296 in which a notice of formal investigation has been issued. *Id.* The MPUC Rules bar *ex parte* communications between the commissioner, or any presiding officer in an adjudicatory proceeding, and MPUC staff, counsel or consultants who have participated as advocates in the adjudicatory proceeding. *See* 65–407 C.M.R. Chapter 11, § 6(K)(3)(b).

The Law Court has noted that, "[t]hough clothed with certain judicial powers, the Public Utilities Commission is not a court in the strict sense of the term. Its functions are mainly legislative and administrative and not judicial." *Hamilton v. Caribou Water, Light & Power Co.,* 121 Me. 422, 423, 117 A. 582 (1922). However, the Law Court more recently has noted that the commissioner's role in a section 296 proceeding is comparable to that of a judge, *see Berry,* 394 A.2d at 793, indicating that the acts of a commissioner in a formal section 296 investigation are properly characterized as adjudicatory. Even though by statute a state agency official at various times may perform legislative, executive and judicial functions, each of which may entitle the official to a different level of immunity, the functional approach to immunity requires that actions taken in the performance of a particular function are to be accorded the level of immunity appropriate to that *function. Cf. Schlegel v. Bebout,* 841 F.2d 937, 944 (9th Cir.1988) (noting that although public utility commissioners may function in a prosecutorial role, in the circumstances of a particular case where commissioners functioned as regulators they were not entitled to absolute immunity); *Reed v. Village of Shorewood,* 704 F.2d 943, 951 (7th Cir.1983) (according separate analysis of each immunity defense interposed, based on defendant's distinct, but simultaneous, roles as local liquor control commissioner (judicial), president of the local board of trustees (legislative), and mayor (administrative), and finding absolute immunity only for judicial and legislative acts); *see also Forrester v. White,* 108 S.Ct. at 544–45 (judges entitled to varying levels of immunity for judicial, legislative, or administrative functions). Although Bradford, as MPUC chairman, was vested with legislative, administrative and judicial responsibilities, Bradford's claim to absolute immunity from damages under section 1983 implicates only his judicial role as a commissioner in the section 296 proceeding.[7]

The MPUC provided CMP and Scott with notice of the section 296 investigation on October 15, 1982. From that point on, Bradford was cast in the role of adjudicator in the section 296 proceeding. Although no hearing took place in the Scott investigation, Bradford was empowered to conduct a formal hearing and to perform judicial acts. For example, he had authority to issue protective orders, *see* 65–407 C.M.R. Chapter 11, § 6(D)(2); to hold a prehearing conference, *see* 65–407 C.M.R. Chapter 11, § 6(E)(1); to issue prehearing orders, *see* 65–407 C.M.R. Chapter 11, § 6(E)(2); and to issue subpoenas, *see* 65–407 C.M.R. Chapter 11, § 6(F). Bradford was obligated by the MPUC Rules to refrain from *ex parte* communication with MPUC staff members acting as advocates in the proceeding, including Moskovitz. *Compare* 5

---

**7.** It bears mention, in the alternative, that certain of Bradford's challenged actions, even if not "judicial acts," almost certainly implicate absolute prosecutorial immunity as the actions of an agency official "responsible for the decision to initiate or continue a proceeding subject to agency adjudication," *Butz,* 438 U.S. at 516, 98 S.Ct. at 2916. *See* discussion at part III B & III B1, *infra.*

U.S.C. § 554(d) (Administrative Procedure Act section, relied on by Supreme Court as insulating federal ALJ's from political influence, *see Butz*, 438 U.S. at 518, 98 S.Ct. at 2916, prohibiting *ex parte* communications between ALJ's and agency staff) *with* 65–407 C.M.R. Chapter 11, § 6(K)(3)(b). A requirement that an official maintain independence from political influence has been held to weigh heavily in favor of a finding of absolute immunity. *See Cleavinger*, 474 U.S. at 203–04, 106 S.Ct. at 502–03; *Butz*, 438 U.S. at 513, 98 S.Ct. at 2914.

In the section 296 proceeding, Scott was entitled to a formal hearing, which he waived in stipulating to the MPUC record on May 11, 1983, *see* Amended Complaint, at ¶ 96; and he was entitled to raise constitutional and other error on judicial review of the MPUC proceedings. It is immaterial for purposes of the present analysis that Scott did not avail himself of these safeguards, *cf. Stump v. Sparkman*, 435 U.S. at 363, 98 S.Ct. at 1108. (absolute judicial immunity attaches "[d]espite the unfairness to litigants that sometimes results"); *Anderson v. Boyd*, 714 F.2d 906, 909 (9th Cir.1983) ("Quasi-judicial immunity completely shields covered officials when they perform the functions which give rise to the need for protection, even when the officials make egregious mistakes in carrying out these duties."), so long as he could have done so under Maine law.[8] By virtue of the legal safeguards available to Scott in those proceedings, Bradford was clothed with absolute immunity for "judicial acts" taken in the course of the section 296 proceedings after October 15, 1982.

■ The amended complaint alleges that Bradford violated Scott's due process rights by (1) failing to conduct an impartial hearing, (2) appointing biased attorneys to conduct the investigation, (3) presiding over the proceedings, despite personal bias, (4) engaging in *ex parte* communications, (5) threatening and charging Scott with contempt, (6) attempting to interfere with the criminal law enforcement process, (7) usurping the powers of the CMP Board of Directors, (8) seeking to punish Scott after he had been prosecuted criminally, and (9) defaming Scott. These alleged actions occurred after the notice of formal investigation issued on October 15, 1982.

The first five claims clearly concern judicial acts taken by Bradford as the presiding commissioner in the section 296 adjudicatory proceeding; as to those claims, Bradford is entitled to absolute immunity. Scott's contentions, *see* (7) & (8) *supra*, that Bradford usurped the powers of the CMP Board of Directors and sought to penalize Scott over and above the sanctions imposed under criminal law, refer, respectively, to Bradford's use of the section 296 proceeding for the dual purpose of coercing CMP to terminate Scott's employment and of facilitating MPUC contempt charges against Scott. Regardless of their lack of propriety, these actions sufficiently related to Bradford's role as the presiding commissioner in the section 296 proceeding to implicate absolute judicial immunity.

■ The remaining claims, however, allege conduct by Bradford completely beyond the pale of the section 296 proceedings: actions performed outside the scope of those proceedings and in interaction

---

**8.** Scott contends that his belated discovery of the *ex parte* communications to which he objects made it impossible for him to seek redress during the section 296 proceeding. The behind-the-scenes nature of the alleged manipulation of Scott's employment status with CMP does cast doubt as to whether the MPUC proceedings offered a suitable forum for raising those particular *ex parte* contacts. *Cf. Hughes v. Black*, 156 Me. 69, 79–81, 160 A.2d 113 (1960) (noting state-law provisions permitting motions to disqualify judges and county commissioners to be filed within a reasonable time after *discovery* of cause for disqualification, even after proceedings have been concluded). On the other hand,

a formal public hearing under section 296, which Scott waived, might well have flushed out any such ethical improprieties—or any other procedural irregularity or impropriety Scott alleges in the amended complaint—so as to enable their timely redress either in the section 296 proceeding itself, or upon later judicial review. Moreover, as the amended complaint makes clear, Scott knew of these *ex parte* communications as early as March 16, 1983, after Scott's discharge from his employment with CMP, but well before Scott stipulated to the MPUC record to avoid a public hearing and well before the section 296 investigation had ended. *See* Amended Complaint, at ¶ 84.

with entities having no standing or function in those proceedings; that is, the Attorney General's Office and the media. Whether these latter claims are cognizable under section 1983 is discussed in Part III C, *infra.*

## B. *The Doctrine of Absolute Prosecutorial Immunity*

In *Butz v. Economou,* the Supreme Court held that attorneys functioning as prosecutors in a federal agency proceeding are entitled to absolute immunity. 438 U.S. at 516–17, 98 S.Ct. at 2915–16. Thus, the Court broadened the scope of absolute prosecutorial immunity established in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). *Imbler* had held that a state prosecutor was absolutely immune from suit for "activities [which] were intimately associated with the judicial phase of the criminal process," 424 U.S. at 430, 96 S.Ct. at 995, but left open whether absolute immunity would extend to a prosecutor's administrative or investigative actions.[9] *Id.*

The *Butz* Court explained its extension of *Imbler* to federal agency officials functioning as prosecutors.

We also believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought....

The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete. Cf. *Imbler v. Pachtman,* 424 U.S. at 426 n. 24 [96 S.Ct. at 993 n. 24].

While there is not likely to be anyone willing and legally able to seek damages from the officials if they do *not* authorize the administrative proceeding, cf. *id.,* at 438 [96 S.Ct. at 998] (White, J., concurring in judgment), there is a serious danger that the decision to authorize proceedings will provoke a retaliatory response. An individual targeted by an administrative proceeding will react angrily and may seek vengeance in the courts. A corporation will muster all of its financial and legal resources in an effort to prevent administrative sanctions. "When millions may turn on regulatory decisions, there is a strong incentive to counter-attack."

The defendant in an enforcement proceeding has ample opportunity to challenge the legality of the proceeding. An administrator's decision to proceed with a case is subject to scrutiny in the proceeding itself. The respondent may present his evidence to an impartial trier of fact and obtain an independent judgment as to whether the prosecution is justified. His claims that the proceeding is unconstitutional may also be heard by the courts....

We believe that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment. Because the legal remedies already available to the defendant in such a proceeding provide sufficient checks on agency zeal, we hold that those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.

438 U.S. at 515–16, 98 S.Ct. at 2915–16 (footnotes omitted). *See also Malachowski v. City of Keene,* 787 F.2d 704, 711 (1st Cir.), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986). *Butz* extended absolute immunity to agency officials who

9. The *Imbler* Court reasoned that to accord only qualified immunity to prosecutors "would undermine performance of [their] duties ...." 424 U.S. at 424, 96 S.Ct. at 992, "pose substantial danger of liability even to the honest prosecutor," *id.* at 425, 96 S.Ct. at 992, and "have an adverse effect on the functioning on the criminal justice system," *id.* at 426, 96 S.Ct. at 993.

initiate administrative proceedings, as well as to those who tender evidence in the proceedings. *See* 438 U.S. at 516, 98 S.Ct. at 2915; *Marrero v. City of Hialeah*, 625 F.2d 499, 506 (5th Cir.1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981).

### 1. *Defendant Moskovitz*

Relying primarily on *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir.1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981), Scott contends that Moskovitz is not entitled to absolute immunity because the challenged actions were administrative or investigative in nature. In *Marrero*, the owner of a jewelry store sought damages under section 1983 against a state prosecutor who allegedly had participated in an illegal search of the jeweler's store and made defamatory press statements regarding the jeweler. The Fifth Circuit held that the prosecutor was not entitled to absolute immunity under *Imbler*, because his actions were taken before any judicial proceedings had been initiated against the plaintiff and were not otherwise "intimately associated with the judicial phase of the criminal process." *See* 625 F.2d at 506 (quoting *Imbler*, 424 U.S. at 430, 96 S.Ct. at 994). The Fifth Circuit held that absolute immunity does not insulate the actions of a state prosecutor taken outside his quasi-judicial functions. *See* 625 F.2d at 507 (citing *Butz*); *see also Werle v. Rhode Island Bar Associations*, 755 F.2d 195, 199 (1st Cir.1985) (only qualified immunity is available for "tangential, investigative or administrative functions the prosecutor may also perform"); *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir.1981) (qualified immunity for state prosecutor who testifies falsely, dis-

tributes extraneous statements to the press designed to harm suspect's reputation, or participates in illegal search).

Consistent with clear Supreme Court precedent, *Marrero* requires that the court scrutinize the nature of the function which was being performed by the prosecutor in determining whether absolute immunity attaches to the challenged actions. *See* 625 F.2d at 504 (citing *Imbler*, 424 U.S. at 430, 96 S.Ct. at 994). The *Marrero* analysis leads to the conclusion that Moskovitz' actions, as alleged in the amended complaint, were clothed with absolute immunity.

Scott demands damages based on Moskovitz' acceptance of appointment as the prosecuting MPUC staff attorney in the Scott investigation, despite Moskovitz' earlier role in the conservation loan proceedings; Moskovitz' alleged violations of Maine Bar Rules 3.2(d)(2), 3.6(d) and 3.7(h)(2); [10] and Moskovitz' alleged *ex parte* communications with other MPUC officials. These allegations pertain to Moskovitz' actions during the section 296 proceedings against Scott. The challenged actions were taken by Moskovitz as the MPUC prosecuting advocate in an *adjudicatory* proceeding, *see* 65–407 C.M.R. Chapter 11, § 6(A)1b, not in an investigative or administrative role unrelated to such a proceeding.

The Magistrate concluded that Moskovitz' communications with CMP officials, by means of which Moskovitz relayed the MPUC's view that Scott would have to be fired by CMP, were analogous to plea discussions. *See* Recommended Disposition, at 18. Prosecutorial activity in the plea bargaining context has been accorded absolute immunity. *See Taylor v. Kavanagh*, 640 F.2d at 453. Although Moskovitz' activity bears some similarity to plea bargain-

---

**10.** Rule 3.2(d)(2) states: "A lawyer who holds public office shall not [u]se his public position to influence, or attempt to influence, a tribunal to act in favor of himself or of a client."

Rule 3.6(d) states: "A lawyer shall not present, or threaten to present, criminal, administrative, or disciplinary charges solely to obtain an advantage in a civil matter."

Rule 3.7(h)(2) states:

In the absence of opposing counsel, a lawyer shall not directly or indirectly communicate with or argue before a judge or tribunal

upon the merits of a contested matter pending before such judge or tribunal, except in open court; nor shall he, without furnishing opposing counsel with a copy thereof, address a written communication to a judge or tribunal concerning the merits of a contested matter pending before such judge or tribunal. This paragraph does not preclude communications permitted by rule of court. For purposes of this paragraph the term "opposing counsel" includes a party who has no counsel.

ing, it differs in important respects. First, at the time of Moskovitz' Brunswick meeting with CMP officials on February 17, no formal charges had been brought against CMP or Scott, as would be the case with plea bargaining in a typical criminal proceeding. Second, no one was in attendance to represent Scott in the putative "plea bargaining" which took place during the Brunswick meeting at which Scott's fate was weighed.

Nevertheless, these distinctions must be considered in light of the *Butz* extension of the *Imbler* rule. Critical to the Court's extension of absolute immunity to agency attorneys was its judgment that "[t]he decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution." *Butz*, 438 U.S. at 515, 98 S.Ct. at 2915.

██ Although the proceeding against Scott was not initiated by formal complaint, the notice of formal investigation under section 296 nonetheless marked the commencement of an adjudicatory proceeding against Scott in which Bradford assumed the role of adjudicator and Moskovitz the role of advocate. *See* 65–407 C.M.R. Chapter 11, §§ 6(A)(1)(b), 6(K)(3)(b); *Berry*, 394 A.2d at 793. The pendency of formal charges is a less significant consideration in determining whether Moskovitz was entitled to absolute immunity than is the fact that an *adjudicatory proceeding had been initiated*. *Butz* extended immunity to officials *"responsible for the decision to initiate or continue a proceeding subject to agency adjudication."* *Butz*, 438 U.S. at 316, 98 S.Ct. at 2916 (emphasis added). The purpose of the section 296 proceeding, as described in the notice of formal investigation, was to determine "whether there was an effort to withhold information from the Commission, who was responsible, and what actions should be taken by the Commission in response to the findings which may be made as a result of this investigation." Amended Complaint, at ¶ 52. Once the notice of formal investigation issued, Moskovitz was the advocate charged with

prosecuting the MPUC investigation; and Scott was entitled to a public hearing, which he elected to waive.

Regardless of the propriety of Moskovitz' decision to meet with CMP officials at Brunswick, and to call for Scott's discharge by CMP, all in Scott's absence, Moskovitz attended the meeting in his role as the MPUC advocate in an adjudicatory proceeding, and absolute prosecutorial immunity forecloses further adversarial inquiry into the constitutionality of those actions.

The appropriateness of absolute prosecutorial immunity in these circumstances must be considered in light of the fact that Scott was entitled to a public hearing as part of the section 296 proceeding. The *Butz* extension of absolute prosecutorial immunity is predicated in part on an assessment that the legal remedies available to the target of an agency investigation normally provide sufficient checks against excessive agency zeal. *See Butz*, 438 U.S. at 516, 98 S.Ct. at 2915. In the present case, the public hearing, with all of its attendant safeguards and the right of judicial review, would have afforded Scott full opportunity to flush out any improprieties in the foregoing section 296 investigation and to obtain remediation of any violations of his rights.

Thus, because Moskovitz' actions were undertaken in his role as MPUC advocate in the section 296 investigation, all of the protections of Maine law were available to Scott as means of relief from prosecutorial improprieties. *Cf. Marrero v. City of Hialeah*, 625 F.2d at 509 (noting that the bounds of the doctrine of absolute prosecutorial immunity are commensurate with the limits of the procedural safeguards built into the judicial system).

The doctrine of absolute immunity does not connote condonation of official misconduct. *See Taylor*, 640 F.2d at 453. Rather, viewed in its appropriate context, absolute immunity recognizes that entertaining private damages claims for the redress of official misconduct poses too great a risk of chilling the performance of official duties. *See Butz*, 438 U.S. at 510, 98 S.Ct. at 2912. Moskovitz' alleged conduct falls

within the range of official conduct to which absolute prosecutorial immunity was intended to apply.

Accordingly, the complaint against Moskovitz must be dismissed.

### C. *Section 1983 Claim Against Bradford for Deprivation of a Liberty or Property Interest*

Although Bradford is entitled to absolute immunity from suit concerning his conduct of the section 296 investigation, defamatory statements made to persons having no connection with the section 296 investigation are not protected by absolute immunity.[11] *Cf. Anderson v. Boyd,* 714 F.2d at 908–10 (parole board officials absolutely immune from suit for action on parole application, but not for circulating false statements about plaintiff to police agencies and racing commission). Under count I of the complaint, therefore, it remains to be determined whether Scott's allegations in the nature of defamation state a section 1983 claim for deprivation of a liberty or property interest.[12]

In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court held that an individual's interest in reputation alone, apart from his employment, is not a liberty or property interest protected by the fourteenth amendment. 424 U.S. at 701, 96 S.Ct. at 1160. Consequently, a defamation claim against a state official for injury to reputation, standing alone, is not cognizable under section 1983. *Id.* But defamation by a state official in the course of a termination of employment, *see Paul,* 424 U.S. at 710, 96 S.Ct. at 1165, which either imposes on the defamed individual "a stigma or other disability that foreclose[s] his freedom to take advantage

of other employment opportunities," *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed. 2d 548 (1972), or includes a charge "that might seriously damage his standing in the community," *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707, may be actionable under section 1983. *See also Endicott v. Huddleston,* 644 F.2d 1208, 1216 (7th Cir.1980); *Ventetuolo v. Burke,* 596 F.2d 476, 482–84 (1st Cir.1979). False accusations of dishonesty and immorality made in the context of a discharge from employment or refusal to rehire, would be actionable under section 1983. *See Roth,* 408 U.S. at 573, 92 S.Ct. at 2707; *Perry v. Federal Bureau of Investigation,* 781 F.2d 1294, 1300 (7th Cir.) (accusations of alcoholism, disloyalty, "communism," or subversive activities), *cert. denied,* 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986); *Beitzell v. Jeffrey,* 643 F.2d 870, 877 (1st Cir.1981).

■ Scott alleges that Bradford repeatedly made defamatory public statements about Scott while trying to get Scott discharged from his employment with CMP. *Cf. Small v. Inhabitants of the City of Belfast,* 547 F.Supp. 761, 763 (D.Me.1982). Bradford allegedly called Scott a "felon." *But see* note 2 *supra.* It is apparent in context that Bradford's alleged stigmatizing of Scott as a "felon" had reference to Scott's testimony before the MPUC and that it may implicate a liberty interest. *See Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. Although Scott's claim differs from the more usual section 1983 claim brought by a *government* employee who has been discharged from government employment, First Circuit precedent makes clear that defamatory statements by a government official, resulting in loss of

---

**11.** In light of the holding that none of Scott's federal claims can survive the absolute immunity defense, the court does not consider whether any of Bradford's actions may be subject to *qualified* immunity.

**12.** The section 1983 claim in the nature of defamation under count I differs from the state-law defamation claim under count XXI. In count I, Scott alleges that Bradford caused or directed CMP to discharge Scott by making "repeated public statements referring to Mr. Scott as a

'felon' and inferring (sic) that Mr. Scott was principally responsible for ... cover-up activities...." Amended Complaint, at ¶¶ 110–11. By contrast, the defamatory statements alleged in count XXI were made *after* Scott's discharge, to George Vilas and to the press. *See* Amended Complaint, at ¶¶ 233–38. Thus, the defamatory statements alleged in count I are unrelated in time or context to those alleged in count XXI, and the latter allegations are subject to independent analysis.

private employment, may infringe upon a private employee's constitutionally protected liberty interest.[13] *See Limerick v. Greenwald,* 666 F.2d 733, 735 (1st Cir.1981) (actionable section 1983 claims against public officials for defamatory statements threatening bank managers' reputations with unusually serious harm, where managers were stripped of managerial responsibilities); *Small v. Inhabitants of the City of Belfast,* 547 F.Supp. at 762–63 (actionable section 1983 claim against city manager for defamatory statements resulting in special police officer's discharge by private employer).

■ Although Scott alleges an actionable infringement of a constitutionally protected liberty interest in his reputation, dismissal of the claim may be appropriate nonetheless if due process was accorded Scott. "The cases make clear that, when a constitutionally protected interest in reputation is at stake, the Fourteenth Amendment requires a proceeding at which plaintiff has an opportunity to clear his name." *Beitzell v. Jeffrey,* 643 F.2d at 879. *See also Board of Regents v. Roth,* 408 U.S. at 564 n. 12, 92 S.Ct. at 2707 n. 12; *Dea v. Look,* 810 F.2d 12, 17 (1st Cir.1987); *Limerick v. Greenwald,* 666 F.2d at 735; *Small v. Inhabitants of the City of Belfast,* 547 F.Supp. at 763. "To be meaningful, the name-clearing proceeding must be run by the same actor who diminished the plaintiff's reputation." *Limerick,* 666 F.2d at 735.

According to the amended complaint, "[o]n May 11, 1983, the MPUC staff, CMP, *and Mr. Scott* … entered into a stipulation which set forth the agreed upon evidentiary and non-evidentiary record *so that*

*the Commission could issue a proposed decision without first having conducted a public hearing.*" Amended Complaint, at ¶ 96 (emphasis added).[14] The formal public hearing under section 296 would have accorded Scott the opportunity to refute Bradford's alleged "repeated public statements falsely referring to Mr. Scott as a 'felon' and inferring (sic) that Mr. Scott was principally responsible for the cover-up activities designed to shield Mr. Thurlow and CMP from adversity," Amended Complaint, at ¶ 110(e). Issues plainly relevant in the section 296 public hearing would have been whether Scott perjured himself and whether he was principally responsible for the MPUC cover-up. Thus, Scott clearly could have presented evidence on these issues in the course of a section 296 formal hearing. *Cf. Beitzell v. Jeffrey,* 643 F.2d at 879 (Grievance Committee hearing on professor's challenge to tenure denial provided professor adequate opportunity to refute department chairman's allegedly defamatory statements in memorandum used as justification for tenure denial.) By foregoing the public hearing Scott waived his state-law based opportunity to clear his name. No actionable due process violation occurred under these circumstances.

The claim that Bradford violated Scott's due process rights by interfering with the criminal prosecution derives from the allegation that Bradford objected to the Maine Attorney General's decision not to pursue perjury charges against Scott, and offered to demonstrate that Scott's false testimony was material to the conservation loan hearing and may have constituted perjury. *See* Amended Complaint, at ¶ 57. No conceivable *constitutional* violation can be gleaned

13. Other courts have found an actionable infringement of a liberty interest notwithstanding the absence of any direct discharge or failure to rehire a government employee. *See, e.g., Larry v. Lawler,* 605 F.2d 954 (7th Cir.1978). In *Lawler,* the Seventh Circuit held that foreclosure from all government employment, coupled with a stigmatic defamatory statement, was sufficient to implicate a constitutionally protected liberty interest of the would-be employee. *Id.* at 958.

14. Prior to his discharge by CMP, Scott allegedly requested a hearing before the CMP Board of Directors. Thurlow advised Scott that "it

would be better for all if a public hearing on the Staff's report could be avoided," and, ultimately, "CMP waived a public hearing on the Scott matter." Amended Complaint, at ¶ 91. It is unclear what public hearing is referred to in ¶ 91. However, any possibility that CMP might impermissibly have waived Scott's right to a formal hearing as part of the section 296 proceeding is negated by Scott's admission that on May 11, 1983, Scott himself waived any such hearing by stipulating to the record. *See* Amended Complaint, at ¶ 96.

from these allegations.[15] Indeed, Scott's submissions are devoid of any plausible suggestion that these allegations raise a constitutional claim.

The section 1983 claims against Bradford must be dismissed.

### D. *Pendent Claims*

■ The Magistrate concluded that dismissal of Scott's federal claims would deprive the court of jurisdiction to hear the pendent state claims against Bradford under counts XXI (defamation) and XXII (interference with advantageous relationship).

A federal court is without jurisdiction of pendent state claims only if the federal claims were " 'so patently without merit as to justify ... the court's dismissal for want of jurisdiction' " or " 'so insubstantial, implausible, foreclosed by prior decisions ... or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court....' " *Hagans v. Lavine*, 415 U.S. 528, 542–43, 94 S.Ct. 1372, 1381–82, 39 L.Ed.2d 577 (1974) (quoting *Bell v. Hood*, 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946); *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666–67, 94 S.Ct. 772, 776–77, 39 L.Ed.2d 73 (1974)). *See also Randall v. Goldmark*, 495 F.2d 356, 358 (1st Cir.) ("[T]here is no pendent jurisdiction ... if the constitutional claim is totally insubstantial."), *cert. denied*, 419 U.S. 879, 95 S.Ct. 144, 42 L.Ed.2d 119 (1974). Where the complaint presents a substantial federal claim, however, exercise of pendent jurisdiction is appropriate provided the federal claims and the pendent state claims derive from a common nucleus of operative fact susceptible to trial in a single judicial proceeding. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

Finally, although the Supreme Court in *Gibbs* indicated that pendent state claims should be dismissed if all federal claims are dismissed prior to trial, *see* 383 U.S. at 726, 86 S.Ct. at 1139, other considerations, such as expiration of the limitations period applicable to the pendent state claims, nevertheless may warrant the exercise of pendent jurisdiction. *See Shahawy v. Harrison*, 778 F.2d 636, 644 (11th Cir.1985); *Federman v. Empire Fire and Marine Insurance Co.*, 597 F.2d 798, 809 (2d Cir.1979); *O'Brien v. Continental Illinois National Bank and Trust Co.*, 593 F.2d 54, 65 (7th Cir.1979); *McLaughlin v. Campbell*, 410 F.Supp. 1321, 1326 (D.Mass.1976); Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* 2d, § 3567.1 (1984). The parties have not addressed these issues.

### IV. ORDER

Accordingly, within 60 days of the date of this order each party shall file a memorandum addressing the issues raised in part III—D of this Memorandum. Reply briefs shall be filed within 90 days of the date of this order.

The Magistrate's Recommended Disposition is ACCEPTED in part. The section 1983 claims against Bradford and Moskovitz are DISMISSED.

SO ORDERED.

---

15. The complaint should be read generously in determining a motion to dismiss. *Limerick v. Greenwald*, 666 F.2d at 735 ("Although the plaintiff's complaint may fairly be characterized as only minimally sufficient, it is adequate to withstand a motion to dismiss.")